IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TINA CRUMBAKER<br>3537 Moxahala Park Road<br>Zanesville, Ohio 43701 | )<br>)<br>) | CASE NO. |
| Plaintiff, | )<br>) | JUDGE: |
| v. | )<br>) | **COMPLAINT FOR DAMAGES AND** |
| | ) | **INJUNCTIVE RELIEF** |
| WAL-MART ASSOCIATES, INC.<br>3724 Northpointe Drive<br>Zanesville, Ohio 43701 | )<br>)<br>) | **(JURY DEMAND ENDORSED**<br>**HEREIN)** |
| | )<br>) | |
| **SERVE ALSO:**<br>WAL-MART ASSOCIATES, INC.<br>c/o CT Corporation System<br>4400 Easton Commons Way, Suite 125<br>Columbus, Ohio 43219 | )<br>)<br>)<br>)<br>)<br>) | |
| Defendant. | )<br>) | |

Plaintiff, Tina Crumbaker, by and through undersigned counsel, as her Complaint against Defendant, states and avers the following:

## PARTIES

1. Plaintiff Crumbaker is a resident of the City of Zanesville, County of Muskingum, State of Ohio.

2. Defendant Wal-Mart Associates, Inc. ("Wal-Mart") is a Delaware for-profit corporation with its principal place of business located in the Bentonville, Arkansas.

3. Wal-Mart's principal place of business in Ohio is in the City of Cleveland, County of Cuyahoga, State of Ohio.

4. Wal-Mart does business as Sam's Club, an Ohio registered trade or fictious name.

5. Wal-Mart was at all times hereinafter mentioned an employer within the meaning of R.C. § 4112.

6. Wal-Mart was at all times hereinafter mentioned an employer within the meaning of 42 U.S.C. § 12101 *et seq.*

## JURISDICTION AND VENUE

7. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that Crumbaker is alleging federal law claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), and the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*

8. All material events alleged in this Complaint occurred in Muskingum County, Ohio.

9. This Court has supplemental jurisdiction over Crumbaker's state law claims pursuant to 28 U.S.C. § 1367 because Crumbaker's state law claims are so closely related to her federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

11. Within 300 days of the conduct alleged below, Crumbaker filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 532-2021-00556, against Wal-Mart ("Crumbaker EEOC Charge").

12. On or about December 30, 2020, the EEOC issued and mailed a Notice of Right to Sue letter regarding the Charges of Discrimination brought by Crumbaker against Wal-Mart in the Crumbaker EEOC Charge.

13. Crumbaker received her Right to Sue letter from the EEOC on or about January 2, 2021, in accordance with 42 U.S.C. § 2000e-5(f)(1), which has been attached hereto as Plaintiff's Exhibit A.

14. Crumbaker has filed this Complaint within 90 days of receipt of the Notice of Right to Sue letter.

15. Crumbaker has properly exhausted her administrative remedies, pursuant to 29 C.F.R. § 1614.407(b).

## FACTS

16. Crumbaker is a former employee of Wal-Mart.

17. Crumbaker began working for Wal-Mart on September 1, 2015.

18. Wal-Mart operates warehouse-style stores called Sam's Clubs.

19. Crumbaker worked at a Sam's Club located in Zanesville, Ohio.

20. Crumbaker was terminated by Wal-Mart on June 26, 2020.

21. At the time of her termination, Crumbaker was a bakery packer.

22. At all times, Crumbaker was qualified for her position.

23. Crumbaker has Lyme disease.

24. Lyme disease is a disability.

25. Wal-Mart perceived Crumbaker as having a disability.

26. Crumbaker's Lyme disease compromises her immune and neurological systems.

27. Symptoms of Lyme disease often are similar to those associated with COVID-19.

28. In the Spring of 2020, Wal-Mart adopted a policy to deal with COVID-19 ("COVID Policy").

29. Under the COVID Policy, employees were required to report symptoms associated with COVID-19.

30. Under the COVID Policy, employees who reported symptoms associated with COVID-19 were required to stay home.

31. Absences required under the COVID Policy did not count toward disciplinary points.

32. Based on the symptoms reported, Wal-Mart would tell employees how long they were to remain home.

33. Because of her Lyme disease, Crumbaker experienced symptoms similar to COVID-19 several times.

34. Crumbaker reported these symptoms to her managers at Wal-Mart.

35. Because her symptoms were similar to those associated with COVID-19, Crumbaker was required to stay home several times pursuant to the COVID Policy.

36. Crumbaker's absences did not exceed twelve weeks over a twelve-month period.

37. On June 18, 2020, Wal-Mart manager Cynthia West told Crumbaker to bake what she could and pack everything before leaving at the end of her shift.

38. Crumbaker did as she was instructed, baking and packing everything she could prior to the end of her shift.

39. The following week, Cynthia West accused Crumbaker of not baking and packing everything prior to leaving at the end of her shift.

40. On June 26, 2020, Crumbaker was terminated.

41. Bakery manager Doug Connors told Crumbaker she was being terminated because she did not bake and pack everything on June 18, 2020, as she was supposed to have done.

42. On information and belief, Wal-Mart has a progressive disciplinary policy ("Discipline Policy").

43. On information and belief, Wal-Mart's Discipline Policy includes coaching, verbal and written warnings, and suspension prior to termination, depending upon the infraction.

44. Termination is the highest level of discipline in the Discipline Policy.

45. Wal-Mart knowingly skipped progressive disciplinary steps in terminating Crumbaker.

46. Wal-Mart knowingly terminated Crumbaker's employment.

47. Wal-Mart knowingly took an adverse employment action against Crumbaker.

48. Wal-Mart knowingly took an adverse action against Crumbaker.

49. Wal-Mart intentionally skipped progressive disciplinary steps in terminating Crumbaker.

50. Wal-Mart intentionally terminated Crumbaker's employment.

51. Wal-Mart intentionally took an adverse employment action against Crumbaker.

52. Wal-Mart intentionally took an adverse action against Crumbaker.

53. Wal-Mart knew that skipping progressive disciplinary steps in terminating Crumbaker would cause her harm, including economic harm.

54. Wal-Mart knew that terminating Crumbaker would cause her harm, including economic harm.

55. Wal-Mart willfully skipped progressive disciplinary steps in terminating Crumbaker.

56. Wal-Mart willfully terminated Crumbaker's employment.

57. Wal-Mart willfully took an adverse employment action against Crumbaker.

58. Wal-Mart willfully took an adverse action against Crumbaker.

59. Crumbaker was treated differently than similarly situated employees because of her disability.

60. Crumbaker was treated differently than similarly situated employees because of her perceived disability.

61. Wal-Mart's stated reason for terminating Crumbaker was a pretext for disability discrimination.

62. At all relevant times, Wal-Mart was engaged in commerce or in an industry or activity affecting commerce and employed 50 or more employees for each working day during each of 20 or more calendar work weeks in the current or preceding calendar year and therefore is an employer as defined in 29 U.S.C. § 2611(4).

63. At all relevant times, Crumbaker was employed by Wal-Mart for at least 12 months and had at least 1,250 hours of service with Wal-Mart and therefore was an "eligible employee" under the FMLA, as that term is defined in 29 U.S.C. § 2611(2)(A).

64. In November 2018, Crumbaker requested two weeks of FMLA leave because her husband was having knee surgery.

65. Under the FMLA, an eligible employee may take FMLA leave to care for a spouse who has a "serious health condition."

66. Knee surgery and the recovery following it constitutes a "serious health condition."

67. It was only after Crumbaker took this FMLA leave that Wal-Mart began finding fault with her work performance.

68. Wal-Mart retaliated against Crumbaker for taking FMLA leave.

69. A clear public policy exists and is manifested in Ohio statutes and/or administrative regulations, or in the common law, to provide a place of employment safe for employees.

70. This policy is manifest in guidance provided by the State of Ohio, Centers for Disease Control ("CDC"), and the Occupational Safety and Health Administration ("OSHA") with respect to COVID-19 pandemic protocols.

71. Between March and July 2020, the State of Ohio Department of Health issued several mandates and regulations regarding appropriate protocols intended to protect the health and welfare of Ohioans, including employees in the workplace.

72. The CDC provided guidance regarding personal protective equipment ("PPE"), social distancing, sanitation, and other protocols to protect "essential workers."

73. OSHA set forth guidelines for necessary PPE based on the employee's risk of exposure to COVID-19 in the workplace.

74. Crumbaker was an "essential worker."

75. Crumbaker was at risk of exposure to COVID-19.

76. Wal-Mart did not enforce appropriate COVID-19 precautions provided by the CDC and OSHA.

77. Employees at Wal-Mart were not consistently wearing masks or face coverings.

78. Employees at Wal-Mart did not follow social-distancing protocols.

79. Wal-Mart did not place markings on the floor to ensure proper social-distancing protocols were being observed by employees.

80. Crumbaker also noticed other health and safety violations, including the stacking of pallets unsafely and in a way that blocked entry and exit from the freezer and created a risk of falling and injury to employees.

81. Crumbaker fell in the freezer because of the unsafe stacking of pallets.

82. Crumbaker was injured as a result.

83. Paramedics were called to the scene to attend to Crumbakere's injuries.

84. Crumbaker informed Wal-Mart of these safety issues.

85. Wal-Mart was well aware of the satefy issue relating to the stacking of pallets because of Crumbaker's fall and the fact that paramedics were called to the scene.

86. Crumbaker requested that Wal-Mart correct the unsafe working conditions.

87. Crumbaker informed Wal-Mart that she intended to file a complaint with OSHA or other government authorities regarding the unsafe working conditions.

88. Subsequent to her termination, Crumbaker filed a complaint with OSHA in or around late June 2020 ("OSHA Complaint").

89. OSHA commenced an investigation into the claims made by Crumbaker.

90. Wal-Mart responded to OSHA's request for information.

91. In its response, Wal-Mart acknowledged that it "did not have proper social distancing markers down to indicate where associates should stand to ensure 6ft between them" prior to Crumbaker's OSHA Complaint.

92. Wal-Mart acknowledged that it did not have a barrier between customers and employees in the bakery prior to Crumbaker's OSHA Complaint.

93. Wal-Mart acknowledged that pallets were unsafely stacked and blocked entry and exit to and from the freezer.

94. Wal-Mart also responded that it addressed the unsafe stacking of pallets with two assistant managers and the bakery lead.

95. On information and belief, Wal-Mart did not terminate the assistant mangers or bakery lead for the unsafe stacking of pallets.

96. Wal-Mart terminated Crumbaker in retaliation for the complaints she made to Wal-Mart about unsafe working conditions.

97. Wal-Mart terminated Crumbaker in retaliation for telling Wal-Mart that she intended to make a complaint to OSHA regarding the unsafe working conditions.

## COUNT I: DISABILITY DISCRIMINATION IN VIOLATON OF AMERICANS WITH DISABILITY ACT, 42 U.S.C. § 12101 *ET SEQ*.

98. Crumbaker restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

99. Wal-Mart treated Crumbaker differently than other similarly situated employees based on her disabling condition.

100. Wal-Mart treated Crumbaker differently than other similarly situated applicants based on her perceived disabling condition.

101. Wal-Mart violated the Americans with Disabilities Act when it terminated Crumbaker.

102. As a direct and proximate result of Wal-Mart's conduct, Crumbaker suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

## COUNT II: DISABILITY DISCRIMINATION IN

## VIOLATION OF R.C. §4112.01 *ET SEQ.*

103. Crumbaker restates each and every prior paragraph of this Complaint, as it were fully restated herein.

104. Wal-Mart treated Crumbaker differently than other similarly-situated employees based on her disabling condition.

105. Wal-Mart treated Crumbaker differently than other similar-situated employees based on her perceived disabling condition.

106. Wal-Mart terminated Crumbaker's employment based on her disability.

107. Wal-Mart terminated Crumbaker's employment based on her perceived disability.

108. Wal-Mart violated R.C. § 4112.02 when it discharged Crumbaker based on her disability.

109. Wal-Mart violated R.C. § 4112.02 when it discharged Crumbaker based on her perceived disability.

110. Wal-Mart violated R.C. § 4112.02 by discriminating against Crumbaker based on her disabling condition.

111. Wal-Mart violated R.C. § 4112.02 by discriminating against Crumbaker based on her perceived disabling condition.

112. As a direct and proximate result of Wal-Mart's conduct, Crumbaker suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

## COUNT III: RETALIATION IN VIOLATION OF FMLA

113. Crumbaker restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

114. During her employment, Crumbaker utilized FMLA leave.

115. After Crumbaker used her qualified FMLA leave, Wal-Mart retaliated against her.

116. Wal-Mart retaliated against Crumbaker by terminating her employment.

117. Wal-Mart willfully retaliated against Crumbaker in violation of 29 U.S.C. § 2615(a).

118. As a direct and proximate result of Wal-Mart's wrongful conduct, Crumbaker is entitled to all damages provided for in 29 U.S.C. §2617, including liquidated damages, costs, and reasonable attorney's fees.

### COUNT IV: WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

119. Crumbaker restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

120. A clear public policy exists and is manifested in Ohio statutes and/or administrative regulations, or in the common law, to provide a place of employment safe for employees.

121. A clear public policy exists and is manifested in Ohio statutes and/or administrative regulations, or in the common law, against terminating and/or retaliating against an employee because he/she engages in protected activity under Ohio law, including the reporting of unsafe working conditions.

122. Crumbaker complained about unsafe working conditions, both to Wal-Mart and, after termination, to OSHA, including the failure of Wal-Mart to follow CDC and OSHA guidelines and rules relating to COVID-19 protocols and the unsafe stacking of pallets in front of a freezer door.

123. Wal-Mart terminated Crumbaker within days of her making these complaints to it.

124. Wal-Mart terminated Crumbaker within days of her telling Wal-Mart that she intended to make a complaint to OSHA or other government entities about the unsafe working conditions.

125. Wal-Mart's termination of Crumbaker jeopardizes these public policies.

126. Wal-Mart's termination of Crumbaker was motivated by conduct related to these public policies.

127. Wal-Mart had no overriding business justification for terminating Crumbaker.

128. As a direct and proximate result of Wal-Mart's conduct, Crumbaker has suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Crumbaker requests judgment against Defendant and for an Order:

(a) Requiring Defendant to restore Crumbaker to one of the positions to which she was entitled by virtue of her application and qualifications, and expunge Crumbaker's personnel file of all negative documentation;

(b) Awarding against Defendant compensatory and monetary damages to compensate Crumbaker for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount to be determined at trial;

(c) Awarding damages, including actual, general, special, incidental, statutory, punitive, treble, liquidated, and consequential to Plaintiff in an amount to be determined at trial;

(d) Awarding pre-judgment and post-judgment interest as provided by law;

(e) Awarding reasonable attorneys' fees and non-taxable costs for Crumbaker's claims as allowable under law;

(f) Awarding the taxable costs of this action; and,

(g) Awarding such other and further relief that this Court deems necessary and proper.

Respectfully submitted,

*/s/ Trisha Breedlove*
Trisha Breedlove (0095852)
**THE SPITZ LAW FIRM, LLC**
1103 Schrock Road, Suite 307
Columbus, Ohio 43229
Phone: (216) 291-4744
Fax: (216) 291-5744
Email: trisha.breedlove@spitzlawfirm.com

*Attorney for Plaintiff Tina Crumbaker*

13

-

## JURY DEMAND

Plaintiff Tina Crumbaker demands a trial by jury by the maximum number of jurors permitted.

>
> */s/ Trisha Breedlove*
> Trisha Breedlove (0095852)
> **THE SPITZ LAW FIRM, LLC**